IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STACEY SMITH, *et al.* | : | No. 07-CV-1214 |
| | : | |
| Plaintiff, | : | Judge John E. Jones III |
| | : | |
| v. | : | |
| | : | |
| CONTINENTAL CASUALTY | : | |
| COMPANY | : | |
| Defendant | : | |

## **MEMORANDUM**

September 30, 2008

The plaintiffs, Stacey and Marjorie Smith, bring this action as assignees of James Sprecher, alleging that the defendant Continental Casualty Company ("Continental") breached its insurance contract with Sprecher and acted in bad faith by denying coverage for a suit the Smiths brought against Sprecher in the Court of Common Pleas of Lebanon County, Pennsylvania. Before the Court is Continental's motion for summary judgment (Doc. 16). Because the Court finds that Continental did not have a duty to defend or indemnify Sprecher and did not deny coverage in bad faith, the motion will be granted.

1

## I.      MOTION TO STRIKE

Before turning to the merits of the motion for summary judgment, the Court must address Continental's motion to strike (Doc. 30) the Smith's addition to their statement of material facts (Doc. 29) submitted in opposition to summary judgment.

On July 1, 2008, Continental filed its motion for summary judgment (Doc. 16), a brief in support thereof (Doc. 18), and a statement of material facts in accordance with Local Rule 56.1 (Doc. 17).  The Smiths filed a brief in opposition to summary judgment (Doc. 19) and a statement of material facts in response to Continental's (Doc. 20) on July 16, 2008.  On July 18, 2008, the Smiths filed corrections to their statement of material facts (Doc. 23).  On July 28, 2008, Continental filed a reply brief in support of its motion for summary judgment (Doc. 26).

On July 29, 2008, thirteen days after their opposition was due and after briefing of the summary judgment motion had closed, the Smiths filed an "Addition to Plaintiffs' Concise Statement of Material Facts" (Doc. 29).  This submission, however, contains no additional material facts, but rather simply attaches the supplemental report of the Smiths' retained expert Donald J. Brayer

(Doc. 29-2).  Brayer's supplemental report was prepared in rebuttal to the report of Continental's expert Linda S. Bowen, which has not been submitted into evidence.

Continental argues that Brayer's supplemental report should be stricken as untimely and because expert testimony is not admissible on the legal issue of policy interpretation.  The Smiths counter that the submission was made in accordance with the Court's scheduling order which set July 20, 2008 as the due date for supplemental expert reports[1], and that Brayer's supplemental report, which focuses primarily on the plaintiffs' bad faith claim, is admissible.

The Court will grant Continental's motion to strike to the extent that the legal conclusions stated in Brayer's supplemental report (and Brayer's initial report, Pls.' Ex. 11, Doc. 22) regarding the interpretation and construction of the insurance policy at issue will not be considered.  "[T]he interpretation of an insurance contract is a matter of law for the court."  *Lexington Ins. Co. v. W. Pa. Hosp.*, 423 F.3d 318, 323 (3d Cir. 2005) (citing *Madison Constr. Co. v.*

---

[1] Based on the scheduling order (Doc. 13), the Smiths argue that striking the supplemental report as untimely "would be effectively allowing the Defendant to dictate the deadline for the submission of Plaintiff's discovery and expert reports and should not be permitted."  (Doc. 34 at 3.)  The Court notes that the scheduling order memorialized the dispositive motion and discovery deadlines chosen by the parties in their joint case management plan (*see* Doc. 12 at 7-9), and thus the defendant – and the plaintiffs – did, in fact, dictate their own deadlines.  The plaintiffs' failure to plan ahead and choose a supplemental expert report deadline which fell prior to the close of briefing on a dispositive motion does not excuse their untimely filing.

*Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (1999)).  It is well-settled that expert testimony regarding legal conclusions, such as the interpretation of an insurance policy, is impermissible.  *See, e.g.*, *Gallatin Fuels, Inc. v. Westchester Fire Ins. Co.*, 410 F. Supp. 2d 417, 421 (W.D. Pa. 2006); *Coregis Ins. Co. v. City of Harrisburg*, 2005 WL 2990694, at *2-3 (M.D. Pa. Nov. 8, 2005); *McCrink v. Peoples Benefit Life Ins. Co.*, 2005 WL 730688, at *3-4 (E.D. Pa. Mar. 29, 2005). The impermissible legal conclusions contained in Brayer's reports, namely Brayer's construction of the policy terms and his conclusion that the possibility of coverage for the Smiths' claim against Sprecher existed when the claim was presented to Continental (*see* Brayer Rep. at 7-10; Brayer Supp. Rep. at 8-11, 12-13, 16-18), will be stricken and will not be considered by the Court in deciding Continental's motion for summary judgment.

The Court will consider the Brayer reports, to some extent, regarding the plaintiffs' bad faith claim.  While not required to establish bad faith on the part of an insurer, expert testimony regarding industry customs and standards is relevant, and often helpful, in assessing the reasonableness of an insurer's conduct in denying coverage.  *McCrink*, 2005 WL 730688, at *4-5; *see also, e.g.*, *Blaylock v. Allstate Ins. Co.*, 2008 WL 80056 (M.D. Pa. Jan. 7, 2008).  However, an expert may not opine as to the ultimate legal issue of whether the insurer has acted in bad

faith, *McCrink*, 2005 WL 730688, at *4 n.1, or the subjective intent of an insurer's

claims handlers, of which the expert has no knowledge, *Gallatin Fuels*, 410 F.

Supp. 2d at 422-23.  To the extent the Breyer reports address insurance industry

standards and whether Continental's conduct conformed to those standards (*see*

Brayer Rep. at 7; Brayer Supp. Rep. at 6-8, 11-12, 15-16), the Court will consider

the reports in deciding Continental's motion for summary judgment, to which we

now turn.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate if the record establishes "that there is no

genuine issue as to any material fact and that the movant is entitled to judgment as

a matter of law."  Fed. R. Civ. P. 56(c).  Initially, the moving party bears the

burden of demonstrating the absence of a genuine issue of material fact.  *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant meets this burden by

pointing to an absence of evidence supporting an essential element as to which the

non-moving party will bear the burden of proof at trial.  *Id.* at 325.  Once the

moving party meets its burden, the burden then shifts to the non-moving party to

show that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e)(2).   An issue is

"genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find

for the non-moving party, and a factual dispute is "material" only if it might affect

the outcome of the action under the governing law.  *Anderson v. Liberty Lobby, Inc*, 477 U.S. 242, 248-49 (1986).

In opposing summary judgment, the non-moving party "may not rely merely on allegations of denials in its own pleadings; rather, its response must ... set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  The non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial."  *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000).  Arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion."  *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109-10 (3d Cir. 1985).  However, the facts and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the non- moving party.  *P.N. v. Clementon Bd. of Educ.*, 442 F.3d 848, 852 (3d Cir. 2006).

Summary judgment should not be granted when there is a disagreement about the facts or the proper inferences that a factfinder could draw from them.  *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982).  Still, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; there must be a

6

*genuine* issue of *material* fact to preclude summary judgment." *Anderson*, 477

U.S. at 247-48.

## III.   BACKGROUND

With this standard of review in mind, the following are the undisputed facts

material to the present motion, drawing any reasonable inferences in favor of the

non-moving party, the Smiths.

### A.   The Underlying Complaint

This action arises from Continental's denial of coverage for a suit brought

by the Smiths against Sprecher.  The Smiths filed suit against Sprecher in the

Dauphin County Court of Common Pleas on August 15, 2003.  (Def.' Statement of

Material Facts ["SMF"], Doc. 17, ¶ 32, Ex. 11.)  The case was then transferred to

the Lebanon County Court of Common Pleas.  (Compl., Doc. 1, ¶ 9.)

In the underlying complaint, the Smiths alleged that they engaged Sprecher,

a financial planner doing business as Your Financial Community of Pennsylvania,

Inc. ("YFC") and an agent of the broker/dealer Hornor, Townsend & Kent

("HTK"), to handle their investments for retirement.  (SMF Ex. 11 at ¶¶ 3, 5, 10.)

The Smiths alleged that they told Sprecher they were long-term investors who

wanted a safe investment that would not be withdrawn until retirement, and that

they had large certificates of deposit for retirement investment.  (*Id.* at ¶¶ 11-12,

14-15.)  The Smiths alleged that Sprecher recommended investing in an offshore asset protection trust managed by his friends in which the Smiths' money would be invested in AAA-rated government insured bonds with a guaranteed 10% annual return, and that Sprecher stated that their investment would be absolutely safe.  (*Id.* at ¶¶ 17-21.)  Based on Sprecher's recommendation, the Smiths cashed their certificates of deposit and, through an arrangement set up by Sprecher, in 1993 and 1996 invested a total of $205,000 with two offshore companies, United Republic, Ltd. and Intrados, SA, both which later merged into or became part of Evergreen Securities.  (*Id.* at ¶¶ 13, 22, 28, 26.)  None of the securities the Smiths purchased were registered under the United States Security Act of 1933 or the Pennsylvania Securities Act of 1972.  (*Id.* at ¶¶ 23-25.)

The Smiths alleged that Sprecher told them their investment would be worth $433,940 by February 2003.  (*Id.* at ¶ 27.)  The Smiths periodically requested statements of the account from Sprecher, and he told them their investment was doing fine.  (*Id.* ¶¶ 32-33.)  However, the Smiths' investment was not doing well. On March 8, 2001, Sprecher notified the Smiths of Evergreen's bankruptcy which had been filed January 23, 2001.  (*Id.* at ¶¶ 36, 38.)  The Smiths allege, based on later investigation by the federal government, that their money was never put into bonds but rather was invested in highly speculative mortgage derivatives through

Evergreen in a trust that was later described as a Ponzi scheme.  (*Id.* at ¶¶ 34-36.)
The Smiths averred that Sprecher was paid by Evergreen out of their account.  (*Id.*
at ¶ 29.)

The Smiths alleged that Sprecher advised them it was not necessary to file a
claim in Evergreen's bankruptcy because a sale of Evergreen's assets would return
their money.  (*Id.* at ¶ 39.)  The Smiths alleged that in the spring of 2001, Sprecher
told them that a potential buyer for Evergreen's Paraguayan anchovy oil
concession had been found and that he and nine other brokers had hired a lawyer to
put the deal together.  (*Id.* at ¶ 40.)  The Smiths alleged that they contacted
Sprecher every two weeks to check on the status of the deal and that as late as
December 2002, Sprecher was still assuring them that there was a potential deal to
sell Evergreen's assets from which they would recover their investment.  (*Id.* at ¶¶
41-42.)  No such deal materialized, and the Smiths received no income and lost
their entire principal investment.  (*Id.* at ¶ 37.)  The Smiths also alleged that the
loss of their retirement fund resulted in the loss of a one-time early retirement
option for Stacey Smith, necessitated Marjorie Smith's continuing to work despite
ill health, and caused both to suffer emotional and physical harm.  (*Id.* at ¶¶ 50-53.)
The Smiths asserted claims for breach of contract, negligent misrepresentation,
intentional misrepresentation, violation of Pennsylvania consumer protection law,

breach of fiduciary duty, and violation of the Pennsylvania Securities Act against Sprecher.[2]  (*Id.* at Counts I-III, VI-X.)

On January 9, 2007, the Smiths and Sprecher entered into a settlement agreement and release whereby Sprecher agreed to pay the Smiths $150,000 and assigned to the Smiths his rights against Continental regarding the Smiths' case. (SMF ¶ 52-55, Ex. 19.)  In this action, the Smiths, as assignees of Sprecher, allege that Continental breach its insurance contract with Sprecher and acted in bad faith by denying coverage for the Smiths' claims.

**B.     The Continental Policy**

Continental issued policy number 140792499 to The Penn Mutual Life Insurance Company ("Penn Mutual") for the policy period of July 31, 2002 to July 31, 2003.  (*Id.* at Ex. 2.)  The companies represented under the claims-made errors and omissions policy are Penn Mutual and its subsidiary HTK.[3]  (*Id.* at Endorsement No. 1, CCC 94.[4])

---

[2] The Smiths also asserted these same claims as well as a negligent supervision claim against YFC and HTK.  (*Id.* at Counts I-X.)

[3] Although never explicitly stated by the parties, there appears to be no dispute that HTK is a wholly-owned broker/dealer subsidiary of Penn Mutual.  *See, e.g.*, Penn Mutual 2007 Annual Report at 10, available at https://www.pennmutual.com/pmlwebsite/pages/PML_Public/ attachments/2007_annualreport.pdf.

[4] Like most insurance policies, the Continental policy is not consecutively paginated, and therefore, the Court will cite to specific policy provisions by the Bates-labeled page numbers of Continental's Exhibit 2.

Coverage for agents and general agents of these companies is provided by

Coverage Part A, the insuring agreement of which provides:

> The Insurer shall pay on behalf of the Insured all Loss which the Insured shall become legally obligated to pay resulting from a Claim made and reported during the Policy Period or the Extended Reporting Period, if applicable, for a Wrongful Act taking place on or after the Prior Acts Date by the Insured, or by any one for whose acts the Insured is legally responsible, solely in the rendering or failing to render Professional Services as an Agent or General Agent.

(*Id.* at CCC 125.)  The policy defines "Wrongful Act" as "any negligent act, error

or omission in, or Personal Injury caused by the rendering or failure to render

Professional Services."  (*Id.* at CCC 74.)  Importantly for purposes of the current

motion, "Professional Services" is defined by Coverage Part A, as modified by

Endorsement 15, as:

> those services arising out of the conduct of the Insured's business as a licensed Agent or General Agent .... Such services shall be limited to:
>
> a.   services as a notary public;
>
> b.   the sale or attempted sale of employee benefit plans, individual retirement arrangements and KEOGH retirement plans;
>
> c.   Administration of Employee Benefit Plans;
>
> d.   The sale or attempted sale or servicing of life insurance, accident and health insurance, long term care insurance, managed health care organization contracts, disability income insurance, fixed

11

annuities, 24-hour care coverage (as defined by statutory law);

e.   the sale or attempted sale or servicing of variable annuities, variable life insurance and mutual funds, which are registered with the Securities Exchange Commission (if required), through a Broker/Dealer that is a member of the National Association of Securities Dealers;

f.   Section 419 Plans which are maintained on file with the Policyholder....

g.   the sale or attempted sale of any employee benefits plan involving self funding in whole or in part, by any employer....

and financial planning activities in conjunction with any of the forgoing, whether or not a separate fee is charged;

h.   a General Agent's supervision, management and training of an Agent, but only with respects to activities of such Agent that would constitute covered Professional Services pursuant to the terms of this Policy....

(*Id.* at CCC 0115-116.)

Coverage for registered representatives and investment advisors is provided

by Coverage Part B, the insuring agreement of which provides:

The Insurer shall pay on behalf of the Insured all Loss which the Insureds shall become legally obligated to pay  resulting from a Claim made and reported during the Policy Period or the Extended Reporting Period, if applicable, for a Wrongful Act taking place on or after the Prior Acts Date by the Insured, or by anyone for whose acts the Insured is legally responsible, solely in rendering or failing to render Professional Services for others for compensation as a Registered Representative of the Broker/Dealer named in Item 2 of the Delcarations

or a Registered Investment Adviser associated with the Broker/Dealer
named in Item 2 of the Declarations.

(*Id.* at CCC 86.)  HTK is the broker/dealer listed in Item 2 of the Declarations.  (*Id.*

at CCC 94.)  Again, importantly for present purposes, "Professional Services" is

defined in Coverage Part B, as modified by Endorsement 16, as:

> those services arising out of the conduct of the Insured's business as a
> Registered Representative or Registered Investment Adviser.   Such
> services shall be limited to:
>
> > a.      Investment Advisory Services;
> >
> > b.      the sale or attempted sale of servicing of securities
> >         (other than variable annuities, variable life insurance
> >         and  mutual  funds)  approved  by  a  Broker/Dealer
> >         named in item 2 of the Declarations and incidental
> >         advice in connection therewith.
>
> and financial planning activities in conjunction with any of the
> foregoing, whether or not a separate fee is charged;
>
> > c.      the  supervision,  management  and  training  of  a
> >         Registered Representative by a registered principal
> >         with respect to activities otherwise covered by this
> >         Coverage Part B....
> >
> > d.      all of the coverages afforded under Coverage Part A
> >         (Agents and General Agents).

(*Id.* at CCC 117.)

For purposes of Coverage Part B, "Investment Advisory Services" means

"advisory services provided pursuant to the Investment Advisers Act of 1940 by an

Investment Advisor Representative or a Registered Investment Advisor" and is

"strictly limited" as follows:

> (1)    all such activities and products must otherwise be within the scope
> of coverage of all terms, exclusions of this Policy, including all
> Coverage Parts contained therein; and

> (2)    any products recommended or sold as a result of such activities
> must be products which have been approved by Hornor Townsend
> & Kent, Inc.

(*Id.* at CCC 126.)  The term "Investment Advisor Representative" means

> a Registered Representative appointed by Hornor Townsend & Kent, Inc.
> to provide Investment Advisory Services on its behalf.  No coverage
> shall be afford for Wrongful Acts which occurred at any time when the
> Investment Advisory Representative was not appointed by Hornor
> Townsend & Kent, Inc., nor shall coverage be afforded for any products
> or services not offered or approved by Hornor Townsend & Kent, Inc.

(*Id.*)

In addition to these coverages, the policy provides that "[t]he Insurer shall

have the right and duty to defend any Claim against the Insureds seeking sums

payable under this Policy, even if any of the allegations of the Claim are

groundless or false."  (*Id.* at CCC 77.)

Two policy exclusions are also potentially at issue.  First Exclusion 14 of the

General Terms and Conditions of the policy, as modified by Endorsement 6,

provides that the policy does not apply to any:

14

Claim arising out of insolvency, receivership, bankruptcy or inability to pay of any organization in which the Insured has, directly or indirectly, placed or obtained coverage or in which an Insured has, directly or indirectly, placed the funds of a client or account; however, this exclusion will not apply in the event that [the Insured placed the funds of a client or account with specified insurance carriers].

(*Id.* at CCC 102.)

Second, Exclusion 6 of Coverage Part B provides that the policy does not apply to any claim:

against a Registered Representative or Registered Investment Adviser involving securities or products not approved by a Broker/Dealer named in Item 2 of the Declarations.

(*Id.* at CCC 88.)

### C.    Continental's Claims Handling

On December 3, 2002, Penn Mutual, on behalf of itself and Sprecher, gave Continental notice of potential claims involving Sprecher's activities.  (SMF ¶ 14.) (*Id.* at Ex. 3.)  Penn Mutual forwarded to Continental the complaint filed against Sprecher in the United States Bankruptcy Court for the Middle District of Florida by R.W. Churchill, the bankruptcy trustee of Evergreen, in which Churchill sought to recover allegedly fraudulent payments from Evergreen to Sprecher (the "Cuthill action").[5]  (*Id.*)

---

[5] Penn Mutual also forwarded to Continental a copy of a letter to Sprecher from the United States Attorney for the Middle District of Florida which advised Sprecher that he was the target a federal grand jury investigation in that district.  (SMF, Ex. 3.)

Effective December 16, 2002, Penn Mutual terminated Sprecher on the grounds that he "did not comply with the Firm's policies and procedures relating to private securities transactions, outside business activities and disclosure of regulatory investigations and did not cooperate in an internal review relating to these matters." (*Id.* at Ex. 4.)  HTK terminated Sprecher effective December 17, 2002, for the same reasons. (*Id.* at Ex. 5.)

Continental began an investigation of the potential claims involving Evergreen, during which Penn Mutual advised Continental that Evergreen was not an approved product of Penn Mutual or HTK, that the sale of Evergreen was not made through HTK, and that the Evergreen products were not registered with the SEC.[6] (*Id.* at ¶¶ 26-27, Ex. 8-9.)

On January 24, 2003, Continental denied coverage to Sprecher for the Cuthill action. (*Id.* at ¶ 30.)  Continental gave two grounds for the denial of coverage.  First, Continental stated that the claim did not fall within the definition of "professional services" in Coverage Part A because the Evergreen securities at

---

[6] The Smiths dispute any paragraph of Continental's statement of material facts which refers to its undertaking an investigation of potential claims involving Evergreen, on the basis that the investigation was conducted by Continental's outside counsel and that there are too few documents in Continental's claims file. (*See* Doc. 20 at 3.)  The Smiths' argument, of course, admits the very fact they purport to deny:  that Continental conducted an investigation.  In reality, the Smiths' do not dispute that Continental investigated the claim; they dispute the adequacy of Continental's investigation as it relates to their bad faith claim.  This argument does not raise a genuine issue of material fact.

issue are not registered with the SEC or sold through a broker/dealer registered with the NASD.  (*Id.* at Ex. 10.)  Second, because Cuthill and Evergeen were not Sprecher's clients, Continental denied coverage on the basis of an exclusion which states that the policy "does not apply to any ... claim by or on behalf of ... any individual or entity that is not a client of the Insured."  (*Id.*)

As noted above, the Smiths filed suit against Sprecher on August 15, 2003. Penn Mutual provided Continental notice of the Smith action on September 3, 2003.  (*Id.* at ¶ 34.)  Penn Mutual enclosed a copy of the Smith complaint, noted that the action was "related to the Evergreen situation, for which [Continental] has denied coverage to Mr. Sprecher", and asked Continental to advise whether the Smith's complaint altered its coverage position as to Sprecher and what its position was regarding coverage for HTK.  (*Id.* at Ex. 12.)  On September 22, 2003, Sprecher, through counsel, separately forwarded a copy of the Smith complaint to Continental and requested Continental's position regarding coverage.  (*Id.* at Ex. 13.)

By separate letters of October 8, 2003, Continental denied coverage to Sprecher and HTK for the Smith action.  (*Id.* at Ex. 16, 17.)  As to Sprecher, Continental gave as grounds for the denial that the claim did not fall within the definition of "professional services" in Coverage Part A because the Evergreen

17

securities at issue are not registered with the SEC or sold through a broker/dealer registered with the NASD.[7]  (*Id.* at Ex. 17.)  As to HTK, Continental denied coverage on the ground that the Evergreen securities at issue were not approved for sale by HTK or sold through HTK.  (*Id.* at Ex. 16.)  HTK did not challenge Continental's denial of coverage.  (*Id.* at ¶ 50; Doc. 20 at 3.)

## III.   DISCUSSION

In support of its motion for summary judgment, Continental argues that the Smith action does not fall within the scope of coverage of Coverage Parts A or B, and that the suit falls under Exclusions 6 and 14.  Continental also argues that the Smiths' bad faith claim must be dismissed.  Each argument is addressed in turn.

### A.     Choice of Law

Where federal jurisdiction is based on diversity of citizenship, as it is here, a court determines which state's substantive law governs by applying the choice of law rules of the jurisdiction in which the district court sits.  *Garcia v. Plaza Oldsmobile Ltd.*, 421 F.3d 216, 219 (3d Cir. 2005) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 497 (1941)).  There is some disagreement among Pennsylvania decisions and federal decisions applying Pennsylvania law as to

_____

[7] Per the request of Sprecher's counsel that Continental also inform him of the reasons for denying coverage of the Cuthill action, Continental also reiterated its denial of coverage for that action on the ground that neither Cuthill nor Evergreen was Sprecher's client.

which choice of law rule governs a contract dispute.  *See Budtel Assoc., LP v. Continental Cas. Co.*, 915 A.2d 640, 643-44 (Pa. Super. Ct. 2006) (collecting cases and concluding that a contacts/interest analysis governs choice of law question in a contract case); *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 228-29 (3d Cir. 2007) (recognizing conflict but predicting Pennsylvania Supreme Court would apply contacts/interest test).  The parties to this action have not explicitly addressed the choice of law question, but they have relied on Pennsylvania law in their submissions and seem to agree that Pennsylvania law governs the insurance contract at issue.  Accordingly, to the extent that the law of a state other than Pennsylvania could control the resolution of the present motion, the issue has been waived by the parties.  *See Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1005 n. 1 (3d Cir. 1980).  Pennsylvania law shall apply.

In applying Pennsylvania law and in the absence of controlling authority from the Supreme Court of Pennsylvania, this Court must predict how that court would resolve the questions posed.  *Colliers Lanard & Axilbund v. Lloyds of London*, 458 F.3d 231, 236 (3d Cir. 2006).  Though not controlling, decisions from Pennsylvania's lower appellate courts are considered predictive, and in the absence of an indication otherwise, shall be accorded significant weight.  *Id.*

### B.   Rules of Policy Interpretation

A court's primary goal in interpreting an insurance policy is to ascertain the parties' intentions as manifested by the policy's terms. *Kvaerner Metals Div. v. Commercial Union Ins. Co.*, 908 A.2d 888, 897 (Pa. 2006). When the language of the policy is clear and unambiguous, the court must give effect to that language. *Id.* When a provision in the policy is ambiguous, "the policy is to be construed in favor of the insured to further the contract's prime purpose of indemnification and against the insurer, as the insurer drafts the policy, and controls coverage." *Id.* "Contractual language is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Prudential Prop. & Cas. Ins. Co. v. Sartno*, 903 A.2d 1170, 1174 (Pa. 2006).

A court's first step in an action concerning insurance coverage is to determine the scope of the policy's coverage. *Gen. Accident Ins. Co. v. Allen*, 692 A.2d 1089, 1095 (1997) (citing *Lucker Mfg. v. Home Ins. Co.*, 23 F.3d 808 (3d Cir. 1994)). "After determining the scope of coverage, the court must examine the complaint in the underlying action to ascertain if it triggers coverage." *Id.* The insured has the initial burden of establishing coverage under the policy. *Butterfeld v. Giuntoli*, 670 A.2d 646, 651-52 (Pa. Super. Ct. 1995). If coverage is established, the insurer then bears the burden of proving an exclusion applies. *Madison Constr. Co.*, 735 A.2d at 106.

### C.    Scope of Coverage

Continental argues that the underlying action does not fall within the scope of the policy's coverage because Sprecher was not rendering "professional services" as defined by the policy.  The Court agrees and finds that the Smiths' action was not potentially covered by the policy.

As detailed above, Coverage Part A provides coverage only for claims arising from rendering or failing to render "professional services."  As is relevant here, Coverage Part A defines "professional services" as "the sale or attempted sale or servicing of variable annuities, variable life insurance and mutual funds, which are registered with the Securities Exchange Commission (if required), through a Broker/Dealer that is a member of the National Association of Securities Dealers ... and financial planning activities in conjunction with any of the foregoing, whether or not a separate fee is charged."  The Evergreen securities which underlie the Smiths' claims against Sprecher were not registered with the SEC, nor were they sold through a broker/dealer registered with the NASD.  Therefore, under the plain and unambiguous language of the policy, the Smiths' claims are not covered.

Coverage Part B also provides coverage only for claims arising from rendering "professional services."  For purposes of Coverage Part B, "professional services" means, in addition to other services not relevant here, "Investment

Advisory Services [and] the sale or attempted sale or servicing of securities ...

approved by a Broker/Dealer named in item 2 of the Declarations and incidental

advice in connection therewith and financial planning activities in conjunction with

any of the foregoing, whether or not a separate fee is charged."   The term

"Investment Advisory Services" is "strictly limited" to "activities and products ...

otherwise ... within the scope of coverage of all terms, exclusions of this Policy,

including all Coverage Parts contained therein; and any products recommended or

sold as a result of such activities must be products which have been approved by

Hornor Townsend & Kent, Inc."

The Smiths action is not within the scope of Coverage Part B.  First, the

claims do not fall within the definition "Investment Advisory Services" because

Sprecher's activities and the Evergreen products at issue are not within the scope

of coverage of all terms and exclusions of the policy, namely Coverage Part A, as

discussed above.  Second, the Evergreen products which Sprecher recommended or

sold were not approved by HTK.[8]  Therefore, Sprecher's activities with regard to

---

[8] Although they do not raise the issue in their brief, there is some indication in their response to Continental's statement of material facts that the Smiths mean to argue that the Evergreen products were in fact approved by HTK.  (*See* Doc. 20 at ¶¶ 17, 21, 24, 57.)  The evidence cited by the Smiths, however, does not support this proposition.  In his deposition, Sprecher stated that he informed HTK generally that he made referrals to estate planning attorneys and CPA's, but he also specifically stated that he did not get permission from HTK to make referrals to offshore asset protection trusts like Evergreen.  (Pl. Ex. 5, Doc. 22 at 24-25.)  Moreover, nothing in Sprecher's annual compliance reviews supports that he informed HTK of

those products to not fall within the definition of "professional services" or "Investment Advisory Services" for purposes of Coverage Part B.

The Smiths argue that their claims against Sprecher are covered by the policy based on a summary of the policy distributed to Sprecher entitled "Highlights of the Errors and Omissions Program."  The Smiths base this argument on a provision of the policy summary which states that covered activities shall include "[r]ecommendation or preparation of a financial program for a client involving the client's present and anticipated assets and liabilities, and shall include recommendations regarding savings, investments, anticipated retirement or other employee benefits."  (Doc. 19 at 6.)  As an initial matter, the Smiths misrepresent the substance of the policy summary by their selective quotation.  The very next sentence of the policy summary states that such activities "shall be limited to products described within the Definition of Professional Services in Items 1.-6. (above) and other than variable annuities, variable life and mutual funds must be sold through Horner, Townsend & Kent, Inc....."  (Pl. Ex. 13 at 7.)  The preceding parts of the policy summary state that, to be covered, mutual funds must

his activities.  (*See* Pl. Ex. 12, Doc. 22-8.)  In fact, these documents support the opposite conclusion.  Sprecher repeatedly answered that he was aware of what products he was permitted to sell through HTK (*id.* at 19, 30, 35) and answered that he was not involved in arranging, financing, or raising capital for third parties; was not involved in any type of consulting services, finders fee arrangement, or other referral arrangements; and did not receive fees from attorneys, CPA's, real estate firms, or other entities for referring clients to them (*id.* at 24).

be sold through a NASD licensed broker/dealer and that other securities must be sold through HTK.  Thus, the policy summary itself explicitly references the same limitations found in the policy.

More importantly, however, it is the language of the policy and not the policy summary that controls the scope of coverage.  This point is explicitly made, and the Smiths' argument refuted, by the very language of the summary itself which, on the first page, states:

> THIS OUTLINE PROVIDES GENERAL INFORMATION REGARDING THE PROFESSIONAL LIABILITY PROGRAM.  IT IS NOT A PART OF THE POLICY, NOR DOES IT MODIFY OR SERVE AS A CONCLUSIVE STATEMENT OF ITS TERMS.  IT IS NOT INTENDED TO INTERPRET THE TERMS OF THE POLICY NOR BE LEGAL ADVICE, BUT RATHER TO SUMMARIZE THE COVERAGE PROVIDED BY THIS PROGRAM.

(Pl. Ex. 13 at 1 [capitalization in original].)  The Court must give effect to unambiguous language of the policy, *Kvaerner*, 908 A.2d at 897, not the policy summary.

The Smiths also argue that the policy is ambiguous because the term "financial planning activities" is undefined.  However, the ambiguity, if any, in that term is irrelevant.  Coverage Parts A and B only cover "financial planning activities *in conjunction with any of the foregoing*" specified professional services. The Smiths have not demonstrated that Sprecher's activities were within the scope

of any of those covered professional services.  Therefore, even if Sprecher was engaged in "financial planning activities", they were not financial planning activities covered by the policy.[9]

The Smiths also argue that, regardless of whether or not the relevant policy provisions are ambiguous, their suit falls within the scope of coverage because it was Sprecher's reasonable expectation that claims based on his investment advice would be covered by the policy.  While the reasonable expectations of the insured are the focal point in interpreting the language of insurance policies, an insured may not complain that his reasonable expectations were frustrated by policy limitations which are clear and unambiguous.  *Brink v. Erie Ins. Group*, 940 A.2d 528, 535-36 (Pa. Super. Ct. 2008) (quoting *Donegal Mut. Ins. Co. v. Baumhammers*, 893 A.2d 797, 819 (Pa. Super. Ct. 2006) (en banc)); *Millers Capital Ins. Co. v. Gambone Bros. Dev. Co., Inc.*, 941 A.2d 706, 717 (Pa. Super. Ct. 2007) (citing *Bubis v. Prudential Property & Cas. Ins. Co.*, 718 A.2d 1270, 1272 (Pa. Super. Ct. 1998)); *see also Betz v. Erie Ins. Exch.*, --- A.2d ----, 2008 WL 4291513, at *4 (Pa. Super. Ct. Sept. 22, 2008) (citing *Allstate Ins. Co. v.*

---

[9] In fact, however, there appears to be no ambiguity in the term.  Both the Smiths and Continental agree that the term encompasses providing investment advice and recommendations. (*See* Doc. 19 at 7; Doc. 26 at 9.)  The relevant point is that Sprecher's investment advice and recommendations were not in conjunction with covered products or activities, the only financial planning activities which fall within the scope of coverage.

*McGovern*, 2008 WL 2120722, at *2 (E.D. Pa. May 20, 2008) (noting "the parties' reasonable expectations remain best evidenced by the language of the insurance policy").  In effect, while the insured's reasonable expectations matter, an insured's expectation cannot be reasonable in light of unambiguous policy language to the contrary.  *See Williams v. Nationwide Mut. Ins. Co.*, 750 A.2d 881, 886 (Pa. Super. Ct. 2000) ("Since the provision at issue is unambiguous and we cannot rewrite the contract as suggested by the insureds, we fail to see how the insureds' reasonable expectations under the policies were left unfulfilled.").  In this case, the unambiguous provisions of the Continental policy, and even the policy summary, make clear that not just *any* investment advice is covered, but rather only investment advice regarding certain specified products and activities.  Sprecher's activities do not fall within the scope of these covered professional services, and any expectation otherwise cannot alter the plain terms of the policy.[10]

------

[10] There is also serious doubt about whether the reasonable expectations doctrine applies in this case at all.  First, while Sprecher was an insured under the Continental policy, the policy was purchased and held by Penn Mutual, a sophisticated commercial entity which clearly has an understanding of insurance contracts.  Pennsylvania case law suggests that the reasonable expectations doctrine protects only unsophisticated, non-commercial insureds.  *See, e.g.*, *Madison Constr. Co.*, 735 A.2d at 106 n.8; *Pressley v. Travelers Prop. Cas. Corp.*, 817 A.2d 1131, 1140 n.3 (Pa. Super. Ct. 2003).  *But see Reliance Ins. Co. v. Moessner*, 121 F.3d 895, 906 (3d Cir. 1997).  Second, under Pennsylvania law, the doctrine of reasonable expectations has been applied only in two "very limited circumstances": to protect a non-commercial insured from policy terms not readily apparent and to protect a non-commercial insured from deception.  *Madison Constr. Co.*, 735 A.2d at 106 n.8; *see also Canal Ins. Co. v. Underwriters at Lloyd's London*, 435 F.3d 431, 440 (3d Cir. 2006); *Liberty Mut. Ins. Co. v. Treesdale, Inc.*, 418 F.3d 330, 344 (3d Cir. 2005).  Neither of these circumstances is presented here.

Finally, the Smiths argue that coverage was triggered by Sprecher's denial that he sold unregistered securities to the Smiths, and that Continental had a duty to defend Sprecher until that fact was determined.  While, in the underlying action, Sprecher did claim that he only gave investment advice to the Smiths and never sold them unregistered securities, this argument is beside the point.  Even if Sprecher only gave investment advice, that advice was in conjunction with unregistered and unapproved securities, and thus does not fall within the scope of the "professional services" covered by the Continental policy.

In sum, the Smiths' claims against Sprecher do not fall within the scope of the Continental policy.  The plain language of Coverage Parts A or B is designed to limit coverage to the activities of agents and registered representatives within the permissible scope of their employment with Penn Mutual and HTK.  These limitations lower Continental's risk, and therefore, the insureds' premiums.  *See Progressive N. Ins. Co. v. Schneck*, 572 Pa. 216, 813 A.2d 828, 833-34 (Pa. 2002) ("By limiting coverage, the insurer lowers its risk, and the cost of insurance is lessened.  The outcome ... is favored.").  Where, as the Smiths allege was the case with Sprecher, an agent or registered representative goes beyond the permissible scope of his duties and recommends or sells unregistered, unapproved securities,

the Continental policy provides no coverage.   Continental therefore had no duty to defend or indemnify Sprecher, and is entitled to summary judgment.

### D.    Exclusions

Moreover, even if the Smiths' claims fell within the scope of the Continental policy, Exclusion 6 of Coverage Part B would exclude coverage.  Exclusion 6 provides that the policy does not apply to any claim "involving securities or products not approved by a Broker/Dealer named in Item 2 of the Declarations." HTK is the broker/dealer named in the declarations, and as discussed above, HTK did not approve the Evergreen products at issue.

Continental also argues that Exclusion 14 of the General Terms and Conditions of the policy, as modified by Endorsement 6, bars coverage.  That exclusion provides that the policy does not apply to any "[c]laim arising out of insolvency, receivership, bankruptcy or inability to pay of any organization in which the Insured has, directly or indirectly, placed or obtained coverage or in which an Insured has, directly or indirectly, placed the funds of a client or account."  No Pennsylvania court appears to have construed a similar insolvency exclusion in an errors and omissions policy.  However, most cases in other jurisdictions construing such an exclusion have found it to bar coverage for claims comparable to those raised by the Smiths.  *See, e.g.*, *Coregis Ins. Co. v. Am. Health*

*Found., Inc.*, 241 F.3d 123, 130-31 (2d Cir. 2001) (collecting cases); *Employers*

*Ins. of Wausau v. Tri World Ins. Agency, Inc.*, 134 F.3d 377, 1998 WL 23677, at *3

(9th Cir. 1998) (unpublished) (collecting cases).[11]

While most courts have interpreted this insolvency exclusion in the context

of suits against insurance brokers who obtain coverage for a client with a

subsequently failed insurance company that is unable to pay the client's claims, the

Seventh Circuit extended the reasoning of these decisions to claims against an

investment advisor in *Transamerica Insurance Co. v. South*, 975 F.2d 321, 328-32

(7th Cir. 1992), a case which presents facts analogous to those presented here.  In

that case, Ronald South, an investment advisor, purchased an errors and omissions

policy from Transamerica which contained a clause excluding coverage for "any

claim arising out of insolvency, receivership or bankruptcy of any organization

(directly or indirectly) in which the Insured has placed or obtained coverage or in

which an Insured has placed the funds of a client or account."  Between February

_____

[11] Some of these cases involve a more broadly worded version of the exclusion which excludes claims "arising out of, based upon or related to" insolvency, *see, e.g.*, *Coregis Ins.*, 241 F.3d at 126, rather than the version in the Continental policy which excludes only claims "arising out of" insolvency.  Pennsylvania courts, however, have broadly construed the phrase "arising out of" in similar policy exclusions.  *See McCabe v. Old Republic Ins. Co.*, 228 A.2d 901, 903 (Pa. 1967) (holding that phrase "arising out of" in policy exclusion was unambiguous and "means causally connected with, not proximately caused by.  'But for' causation, *i.e.*, a cause and result relationship, is enough to satisfy this provision of the policy"); *Forum Ins. Co. v. Allied Sec., Inc.*, 866 F.2d 80, 82 (3d Cir. 1989) (recognizing *McCabe* as governing Pennsylvania law).

and September 1998, South recommended to several clients the purchase of annuity contracts issued by First Columbia Life Insurance Company, allegedly telling his clients that the annuities were guaranteed and risk-free.  If First Columbia had been authorized to do business in Illinois, the Illinois Insurance Guarantee Fund would have guaranteed the investments.  However, South failed to check with the Illinois Department of Insurance before recommending the annuities, and did not learn that First Columbia was not authorized to do business in Illinois and was in poor financial condition.  In November 1988, First Columbia was declared insolvent, and South's clients filed suit to recover their lost investments, alleging that South was negligent in failing to investigate the investments and misrepresented their safety.  South tendered the claims to Transamerica which filed a declaratory judgment action seeking a declaration that it had no duty to defend or indemnify South.

The Seventh Circuit held it was "clear and free from doubt that the claims do fall within the exclusion."  *Id.* at 328.  The court explained that the claims arose out of the insolvency of the organization in which the insured had placed client funds because "[h]ad First Columbia been solvent, the fact that it was not authorized to transact business in Illinois would have been of no import: under Illinois law, although an insurer is not authorized to do business, all contracts with that insurer

are still valid and enforceable." *Id.*  South argued that the misrepresentation claims against him did not fall within the exclusion, because even if First Columbia were solvent, the annuities would still not be guaranteed by the state fund.  However, the court rejected this argument on the ground that "any such claims would be meritless because the plaintiffs would have suffered no injury and therefore could claim no damage from such a misrepresentation, by itself." *Id.*  The court also rejected South's argument that the term "arising out of" was ambiguous, holding that when modified by the phrase "directly or indirectly," the exclusion unambiguously excluded coverage for claims that directly or indirectly arise out of the insolvency of any organization in which an insured places the funds of a client. *Id.* at 329.  Finally, South argued that the claims against him had two proximate causes: the insolvency of First Columbia and his negligence, one of which was covered and one excluded, and therefore the entire claim had to be covered.  The Seventh Circuit also rejected this argument.  While agreeing that South's failure to investigate First Columbia was a second cause of the clients' injuries, along with First Columbia's insolvency, the court emphasized that these two causes were not wholly independent.  Rather, South was only negligent because of First Columbia's insolvency.   If First Columbia had been healthy and solvent, South would not have been liable for negligence as his clients would have suffered no

injury.  The court held that because the excluded cause predominated, the insurer had no duty to defend or indemnify.  *Id.* at 330-31.

The facts of this case are quite analogous to those presented in *South.*  The Smiths allege that Sprecher misrepresented the safety of the Evergreen funds and negligently recommended that they invest in such securities.  Evergreen declared bankruptcy, and the Smiths lost their investments.  While the Smiths asserted several different theories of recovery against Sprecher, each of their claims is premised on the fact that Sprecher, directly or indirectly, placed their funds in Evergreen, which then went bankrupt and was unable to pay any return on their investment.  *See Mut. Benefit Ins. Co. v. Haver*, 725 A.2d 743, 745 (Pa. 1999) (stating "the particular cause of action that a complainant pleads is not determinative of whether coverage has been triggered.  Instead it is necessary to look at the factual allegations contained in the complaint").  The Smiths' claims thus "arise out of" Evergreen's bankruptcy and inability to pay; were it not for these circumstances, the Smiths would not have filed suit against Sprecher.  *See McCabe*, 228 A.2d at 903 (holding that phrase "arising out of" in policy exclusion requires only "but for" causation).  In the absence of controlling Pennsylvania authority on this issue, the Court will follow the reasoning of the Seventh Circuit's

decision in *South* and hold that Exclusion 14 of the Continental policy bars

coverage for the Smiths' claims.

### E.    Bad Faith

Finally, Continental argues that the Smiths' bad faith claim must be

dismissed.  The Pennsylvania bad faith statute provides:

> In an action arising under an insurance policy, if the court finds that the
> insurer has acted in bad faith toward the insured, the court may take all
> of the following actions:
>
> (1) Award interest on the amount of the claim from the date the claim
> was made by the insured in an amount equal to the prime rate of interest
> plus 3%.
>
> (2) Award punitive damages against the insurer.
>
> (3) Assess court costs and attorney fees against the insurer.

42 Pa. C.S.A. § 8371.  The statute does not define "bad faith" or set out the manner

in which a party must prove bad faith, and the Pennsylvania Supreme Court has not

addressed these issues.  *Greene v. United Servs. Auto. Ass'n*, 936 A.2d 1178, 1187

(Pa. Super. Ct. 2007).  However, the Pennsylvania Superior Court has addressed

these issues, and the Third Circuit has predicted that the Pennsylvania Supreme

Court would define "bad faith" according to the definition set forth by the

Pennsylvania Superior Court in *Terletsky v. Prudential Property and Casualty Ins.*

*Co.*, 649 A.2d 680 (Pa. Super. Ct. 1984).  *Nw. Mut. Life Ins. Co. v. Babayan*, 430

F.3d 121, 137 (3d Cir. 2005) (citing *Keefe v. Prudential Prop. & Cas. Ins. Co.*, 203

F.3d 218, 225 (3d Cir. 2000)).  "Bad faith" on the part of an insurer is:

> any frivolous or unfounded refusal to pay proceeds of a policy; it is not
> necessary that such refusal be fraudulent. For purposes of an action
> against an insurer for failure to pay a claim, such conduct imports a
> dishonest purpose and means a breach of a known duty (*i.e.*, good faith
> and fair dealing), through some motive of self-interest or ill will; mere
> negligence or bad judgment is not bad faith.

*Terletsky*, 649 A.2d at 688 (quoting Black's Law Dictionary 139 (6th ed. 1990))

(citations omitted).

The term "bad faith" encompasses a wide variety of objectionable conduct,

as described by the Superior Court:

> For example, bad faith exists where the insurer did not have a reasonable
> basis for denying benefits under the policy and that the insurer knew of
> or recklessly disregarded its lack of reasonable basis in denying the
> claim.  Bad faith conduct also includes lack of good faith investigation
> into facts, and failure to communicate with the claimant....
>
> On the other hand, our Courts have not recognized bad faith where the
> insurer makes a low but reasonable estimate of the insured's losses, or
> where the insurer made a reasonable legal conclusion based on an area
> of the law that is uncertain or in flux.
>
> To constitute bad faith, it is not necessary that the insurer's conduct be
> fraudulent.  However, mere negligence or bad judgment is not bad faith.
> To support a finding of bad faith, the insurer's conduct must be such as
> to import a dishonest purpose.  In other words, the plaintiff must show
> that the insurer breached its duty of good faith through some motive of
> self-interest or ill-will.  Bad faith must be shown by clear and convincing
> evidence.

*Greene*, 936 A.2d at 1187-88 (quoting *Brown v. Progressive Insurance Co.*, 860 A.2d 493 (Pa. Super. Ct. 2004)); *see also Babayan*, 430 F.3d at 137.

Thus, "[t]o prove bad faith, a plaintiff must show by clear and convincing evidence that the insurer (1) did not have a reasonable basis for denying benefits under the policy and (2) knew or recklessly disregarded its lack of a reasonable basis in denying the claim." *Greene*, 936 A.2d at 1189 (quoting *Condio v. Erie Ins. Exch.*, 899 A.2d 1136, 1143 (Pa. Super. Ct. 2006)).  Although there is a requisite level of culpability associated with a finding of bad faith and negligence will not support such a claim, "the 'motive of self-interest or ill will' level of culpability is not a third element required for a finding of bad faith, but it is probative of the second element identified in *Terletsky*, *i.e.*, 'the insurer knew or recklessly disregarded its lack of reasonable basis in denying the claim.'" *Id.* at 1189-90 (approving of reasoning and holding of *Employers Mut. Cas. Co. v. Loos*, 476 F. Supp. 2d 478, 490-91 (W.D. Pa. 2007)).  "At the summary judgment stage, the insured's burden in opposing a summary judgment motion brought by the insurer is commensurately high because the court must view the evidence presented in light of the substantive evidentiary burden at trial." *Babayan*, 430 F.3d at 137 (quoting *Kosierowski v. Allstate Ins. Co.*, 51 F. Supp. 2d 583, 588 (E.D. Pa. 1999)).

In this case, the Smiths have not met this high burden.  As the Court has determined that Sprecher's activities upon which the Smiths' claims are premised do not fall within the definition of covered "professional services," Continental clearly had a reasonable basis for denying coverage.  The Smiths argue that Continental's investigation of the claim was inadequate because it was conducted by outside counsel, because Continental's claims handler attended only two meetings regarding claims against Sprecher, and because Continental did not contact Sprecher prior to denying coverage.  These facts, however, are not clear and convincing evidence of a bad faith investigation.  Continental engaged experienced coverage counsel to evaluate Sprecher's claims, met with coverage counsel to discuss the claims, and spoke with representatives of Penn Mutual and HTK in gathering information regarding the claim.  These facts do not demonstrate any dishonesty or ill-will in the conduct of Continental's investigation into Sprecher's claims.

The Smiths also rehash their argument based on Sprecher's contention that he did not sell unregistered securities, but only recommended them, by arguing that, at the time it denied coverage, Continental did not have enough information to determine whether Sprecher had, in fact, sold unregistered securities.  As discussed above, however, this argument is beside the point.  Even if Sprecher only gave

investment advice, that advice is not covered by the Continental policy if it was in conjunction with securities that were not approved by HTK.  Continental's investigation, including its contact with HTK, revealed that the Evergreen securities were not approved by HTK, and therefore, regardless of whether Sprecher sold or merely recommended such products, Continental had  reasonable grounds, based on reasonable investigation, to deny coverage.

Finally, the Smiths argue that Continental's investigation was conducted in bad faith because it did not contact Sprecher prior to denying coverage, in contravention of its own claims handing guidelines which state that "[c]laim professionals should attempt to contact the insured or their representative" and "[s]olicit the insured's comments regarding the allegations being made by the claimant."  (Doc. 19 at 11-12.)  Continental did, however, contact Penn Mutual and HTK, the principals for whom Sprecher was an agent and registered representative, and based on the information gained through its investigation determined that there was no coverage irrespective of Sprecher's comments regarding the claims against him.  Although failing to contact Sprecher prior to denying coverage was perhaps not a "best practice" and may have shown bad judgment by Continental, such conduct is not evidence of bad faith.  *See* Greene, 936 A.2d at 1187-88 (stating "mere negligence or bad judgment is not bad faith").

37

The Smiths have not produced clear and convincing evidence from which a reasonable jury could find that Continental denied coverage to Sprecher in bad faith, and therefore, Continental is entitled to summary judgment.

## IV.   CONCLUSION

For the foregoing reasons, the Court holds that Continental had no duty to defend or indemnify Sprecher against the Smiths' action and that Continental did not act in bad faith in denying coverage.[12]   Continental's motion for summary judgment will be granted by appropriate order.

---

[12] Continental also argues that, even if coverage were available, the Smiths' recovery would be limited to the amount Sprecher paid them to settle the underlying claim.  Given the disposition of the question of coverage for the underlying action, the Court does not reach this issue.